Filed 8/7/26  In re S.C. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.C. et al., Persons Coming Under the Juvenile Court Law. | B349111 (Los Angeles County Super. Ct. No. 25CCJP01847AB) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>SAMUEL C.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Dash Talbot, Judge Pro Tempore.  Affirmed.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Principal Deputy County Counsel, and Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, Samuel C. (father) challenges the juvenile court's jurisdictional findings and dispositional orders. Father argues substantial evidence does not support the court's findings that his history of and current substance abuse as well as his violent behavior put his two minor children at substantial risk of harm. Father also argues substantial evidence does not support the juvenile court's order removing the children from him. We find no error and affirm.

## BACKGROUND

### 1. The Family

Father and C.M. (mother) have two children together, a daughter, S.C. (daughter), and a son, S.C. (son). When the underlying proceedings began, daughter was six years old and son was five years old. At the time, father had full legal and physical custody of the children pursuant to a September 2024 family court order. The children lived with father, paternal grandparents, two paternal uncles, and a paternal aunt. Paternal grandparents were the children's primary caregivers.

Three years earlier, mother experienced mental health issues, had been homeless, and could not care for the children. She abandoned the children in front of father's home in a car with the engine running. She left a note stating she was "not

2

mentally, financially or emotionally stable," asking father to care for the children, and giving him custody of the children. Since then, mother had enrolled in therapy through her church and was in a healthy mental state. She was living with her mother (maternal grandmother) and had visits with the children, including overnight visits every other weekend.

## 2. Events Preceding Petition

In June 2025, a fight broke out between father and paternal uncles at the home they shared. There were conflicting reports on how or why the fight began. One paternal uncle said father was inebriated and calling both paternal uncles names. Father said he was "non-confrontational" and the uncles were talking about him, then "jumped on him first." He said, " 'They jumped me. It was not my decision.' " The fight moved through the home, knocking a speaker and other things over, and eventually ended outside the front door. One paternal uncle sustained a black eye, a three-inch laceration to his cheek, and a bloody lip. Law enforcement was called.

The children were home when the fight occurred and witnessed some of it. They saw blood and daughter saw the injuries her uncle had sustained. The paternal aunt moved the children into a bedroom, where one of the paternal uncles joined them and locked the door. At some point during the altercation, father tried to get into the bedroom and was banging on the door. The children were scared and crying. Daughter said father " 'was trying to hurt us' " and " 'was drinking, and smoking. He got all crazy, and he was trying to hurt us. He was out of control.' " Nonetheless, daughter was not afraid father would hurt her, but she was afraid father would "do more bad things to other people." One of the paternal uncles reported father pushed and knocked

over the children during the fight, but the children denied being pushed. Eventually, father fled, leaving the children with relatives.

Paternal uncles reported this was not their first physical altercation with father. They said, "[F]ather is often out of control and causing fights in the home, and this is the worst fight yet." One paternal uncle "was upset and tired of [father]" and said he was "done with my brother." It was reported that law enforcement knew the family and had been to the home on a weekly basis because of "disputes in the home with father." However, father stated "he had never put his hands on his brother."

Mother and father both denied domestic violence in their relationship. However, mother mentioned a few incidents when father pushed her, including one time he pushed her from a moving car he was driving while the children were in the backseat. Mother said father also pushed a maternal uncle. Additionally, County of Los Angeles Sheriff Department reports from 2021 and 2024 revealed prior incidents of domestic violence between mother and father, including incidents for which father was arrested. Daughter also mentioned a fight between mother and father, noting she "told them to stop," "[m]y mom called the police, and then my dad got arrested." Paternal grandfather said mother and father used to fight a lot, including one time when mother "put a knife to [father's] throat." Similarly, father referenced incidents in the past when he pushed mother and "we would smack each other."

It was also reported father was "known to use meth and computer cleaner." Although it was unclear what substances father was using around the time of the June 2025 altercation,

one of the paternal uncles was sure father was using "because there is such a difference in father's mood when he uses."  The paternal uncle believed father was a good father "until he starts drinking and doing drugs."  Paternal grandmother stated father drinks when he is stressed and " 'likes to argue when he drinks.' "  Daughter said, "[W]hen she is asleep in the house, father is in the other room drinking beer and doing bad things."  Son saw father smoke and drink beer.  According to mother, "father had a problem with drinking three years ago," but she believed he had stopped drinking.  Mother reported father had been "argumentative with her recently."  Prior to the June 2025 altercation, however, mother "had no concerns," stating father "has been good to the children."

In the wake of the June 2025 altercation, father admitted that, after three years of sobriety, he had started drinking again one month earlier "because he was stressed."  He also admitted he smoked marijuana and abused Adderall.  Father previously had been convicted of drug possession, driving without a license, and driving under the influence.  Following a 2019 arrest for possession of cocaine, father was ordered to attend and did attend Narcotics Anonymous meetings.  Similarly, following a 2023 arrest for driving under the influence, father was ordered to attend Alcoholics Anonymous meetings and enroll in the Drinking Driver Program.  However, father failed to complete those court-ordered programs, resulting in the issuance of a bench warrant in April 2025.  The next month (i.e., the month before his June 2025 altercation with paternal uncles), father was again arrested for, among other things, altering or removing the identification mark on a firearm and having an outstanding bench warrant.

5

Following the June 2025 altercation, a referral was made to the Los Angeles County Department of Children and Family Services (Department) and the juvenile court granted the Department's request to remove the children from father. The children were released to mother.

### 3. Petition

On June 20, 2025, the Department filed a three-count Welfare and Institutions Code section 300 petition on behalf of the children (petition).[1] The petition alleged the children were at risk of harm due to father's violent behavior, father's history of and current substance abuse, and mother's failure to protect the children from father's substance abuse.

At the initial hearing on the petition held in early July 2025, the juvenile court detained the children from father and maintained their release to mother. Father was granted monitored visits. Father did not attend the initial hearing, however, because he had entered a substance abuse program and was not allowed outside contact. Father made his first appearance in the proceedings in early August 2025, at which time the court ordered weekly on-demand drug testing for father as well as monitored visits with the children.

### 4. Adjudication and Disposition

In late August 2025, father told a Department social worker he had "started to go to AA groups" and had gone to "a rehab" but "left because he wanted to be present in Court." Father's Alcoholics Anonymous attendance card showed he

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

6

attended seven meetings in August 2025.  The last meeting father attended was on August 27, 2025.

A September 2025 report for the court revealed father was not abiding by the court's visitation order.  During one visit, the monitors (paternal grandparents) went to church, leaving father alone with the children.  When asked about the unmonitored time, father stated "he didn't think he needed to be supervised with his own kids."  In addition, at the end of one visit, father and paternal grandfather yelled at mother in front of the children, exclaiming "they should be able to keep the children as long as they want."

On September 17, 2025, the juvenile court held a combined jurisdiction and disposition hearing.  The court found "[t]here is clearly a history of substance use and substance abuse by father" and "all the relatives" noted father tended to become "aggressive or violent when he is drinking."  The court also found that, during the June 2025 altercation, "[t]here was a lot of chaos in the home," "[s]peakers were falling over," and the children were "in the zone of danger" and "afraid for their own personal safety."

The juvenile court dismissed the allegations concerning mother (i.e., failure to protect) and sustained the allegations as to father (i.e., violent behavior and substance abuse).  The court declared the children dependents of the court under subdivisions (a) and (b) of section 300, removed the children from father, and maintained their placement with mother.  The court ordered father to complete a full drug and alcohol program with aftercare, to submit to drug testing, to enroll in a 12-step program as well as parenting classes and counseling.  The court also ordered monitored visitation for father.

Father appealed the juvenile court's September 17, 2025, orders.

## DISCUSSION

Father makes two arguments on appeal. First, father argues the juvenile court erred when it found dependency jurisdiction based on his violent behavior and substance abuse. Second, father contends the juvenile court erred when it removed the children from his custody and care. We consider each argument in turn.

### 1. Jurisdiction

#### a. Applicable Law

The juvenile court found jurisdiction under both subdivisions (a) and (b) of section 300. We consider subdivision (b) first. Under that subdivision, a juvenile court may assert dependency jurisdiction over a child when, among other things, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. . . . [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b)(1) (subdivision (b)).) In subdivision (b), " 'substance abuse' bears its ordinary meaning of excessive use of drugs or alcohol." (*In re N.R.* (2023) 15 Cal.5th 520, 555.)

In certain circumstances, even if the minors at issue have not been physically harmed, both substance abuse and domestic violence may be grounds for dependency jurisdiction under subdivision (b). (*In re N.R.*, *supra*, 15 Cal.5th at p. 531; *In re T.V.* (2013) 217 Cal.App.4th 126, 134.) "The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the

8

time of the jurisdictional hearing ' "subject the minor to the defined risk of harm." ' [Citation.] 'The court may consider past events in deciding whether a child currently needs the court's protection.' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 411.) "To establish a defined risk of harm at the time of the hearing, there ' "must be some reason beyond mere speculation to believe the alleged conduct will recur." ' " (*Ibid.*)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.*, *supra*, at p. 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

### b.    Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the

9

light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings [and disposition order] of the trial court." ' " (*Ibid.*)  In determining whether substantial evidence exists such that a reasonable trier of fact could find the order challenged on appeal is appropriate, we review the entire record in the light most favorable to the challenged order.  (*Ibid.*)

"Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)  Substantial evidence " 'is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' " (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

> **c.** **Substantial evidence supports the juvenile court's jurisdictional findings under subdivision (b).**

Under subdivision (b), for dependency jurisdiction to exist based on a parent's substance abuse, the substance abuse "must render a parent . . . unable to provide regular care for a child and either cause the child to suffer serious physical harm or illness or place the child at substantial risk of suffering such harm or illness." (*In re N.R.*, *supra*, 15 Cal.5th at p. 531.)  "Substance abuse, when shown to exist, should not be regarded as automatically amounting to prima facie evidence of the other facts required for dependency jurisdiction." (*Id.* at p. 559.)

Here, it cannot reasonably be disputed that father struggled with substance abuse.  Father admitted he had

relapsed and was drinking and using drugs in the months prior to the June 2025 altercation. Father said he started drinking again "because he was stressed." Father also had a well-documented history of substance abuse and failure to follow through with court-ordered programs. At the time of adjudication, father still was in the midst of his relapse. Although he had entered a rehabilitation program, there was no indication he completed it. He had attended only a handful of Alcoholics Anonymous meetings. Moreover, the record does not indicate whether father was addressing the stress that triggered his relapse.

Additionally, father's unresolved substance abuse directly affected his ability to care for his children. Multiple people reported father became belligerent when he drank. The June 2025 altercation is evidence of that. A paternal uncle stated father was a good father "until he starts drinking and doing drugs." Indeed, although the children had not been physically harmed to date, father's alcohol-fueled violent behavior put the children directly in harm's way. Thus, contrary to father's suggestion, the juvenile court did not exercise jurisdiction based solely on father's substance abuse. Given father's admitted and, at the time untreated, relapse as well as the multiple reports of his violent behavior when intoxicated in the children's presence, including the June 2025 altercation, we conclude substantial evidence supports the court's exercise of jurisdiction based on father's history of and current substance abuse.

Similarly, substantial evidence supports the finding that father's violent behavior put the children at substantial risk of serious harm. The June 2025 altercation was indisputably violent and resulted in one of the paternal uncles being seriously

injured.  A portion of the fight took place in the children's presence.  Daughter saw her uncle injured and bloody. Household items fell over during the fighting and while the children were present.  The children were scared and crying as they sheltered in a locked bedroom, which father tried to enter. The record reveals this was not father's first physical incident with paternal uncles, with whom father and the children were living.  Additionally, the record reveals a history of violence between father and mother, which father denied.  "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)  Based on father's history of violent behavior, lack of insight, lack of effort to address the issue, and recent relapse, it was reasonable to believe father's violent behavior would continue.

Father claims the juvenile court made its jurisdictional findings based on a single incident of violent behavior—namely, the June 2025 altercation.  This is incorrect.  The record includes multiple references to past physical incidents between both father and paternal uncles and father and mother, including some in the children's presence.  It was reported law enforcement knew the family and had been to father's home on a weekly basis. Father also suggests one of the paternal uncles was not credible and, therefore, we should discount his description of events. However, as noted above, we cannot reweigh the evidence or make credibility determinations.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)  By all accounts, including father's, his violent behavior was worsening at least in part due to his admitted substance abuse, which triggered his aggressive and physical behavior. Considering the entire record, we conclude substantial evidence supported dependency jurisdiction under subdivision (b).

Because we conclude jurisdiction was proper under subdivision (b), we need not consider the subdivision (a) allegations. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Father asks us nonetheless to exercise our discretion to consider the sustained subdivision (a) allegations. We decline to do so.

**2.    Removal**

**a.    Applicable Law and Standard of Review**

When a child has been adjudged a dependent child within the meaning of section 300, the juvenile court "may limit the control to be exercised over the dependent child by any parent" if necessary to protect the child. (§ 361, subd. (a)(1).) Section 361, subdivision (c)(1) permits the juvenile court to order a child removed from his or her parent if the court finds by clear and convincing evidence that the child is, or would be, at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. " ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." ' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*).) In making its determination, the juvenile court may consider the parent's past conduct, present circumstances, and "the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

We review the juvenile court's removal order under the substantial evidence standard of review, bearing in mind the heightened burden of proof by clear and convincing evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; *In re A.F.*, *supra*, 3 Cal.App.5th at p. 292; *O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012;

13

see *In re V.L.* (2020) 54 Cal.App.5th 147, 155 ["*O.B.* is controlling in dependency cases"].) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.)

> b. **Substantial evidence supports the juvenile court's removal order.**

The evidence discussed above that supports the court's jurisdictional findings also supports the court's removal order. In addition, father demonstrated a lack of understanding or, worse, a disregard for the importance of the juvenile court's earlier orders. Although the court had ordered father's visits with the children be monitored, father had at least one unmonitored visit with the children. He believed he did not need to be supervised with his own children. Moreover, paternal grandparents—who ostensibly could have helped father care for the children during the underlying proceedings—also did not abide by the court's monitored visitation order. Finally, father and paternal grandfather yelled at mother in front of the children, expressing their belief that they should be able to have the children as long as they wanted. In sum, in addition to father's troubling behaviors discussed above, neither father nor paternal grandparents demonstrated they would abide by the court's

14

orders, which were made to keep the children safe.  We conclude substantial evidence supported the juvenile court's removal order.

## DISPOSITION

The juvenile court's September 17, 2025 orders are affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


GOORVITCH, J.

15